

NUMBER 13-11-00127-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF D.G., N.K., AND C.K., CHILDREN

**On appeal from the 24th District Court
of Victoria County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Justice Vela**

This is an appeal from a trial court order terminating the parental rights of appellant, T.G. to her three biological sons, D.G., N.K., and C.K. The trial court determined that there was clear and convincing evidence that appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly

placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.   *See* TEX. FAM. CODE ANN. § 161.001(1)(D) & (E) (West Supp. 2011).   By four issues, appellant argues that the evidence is legally and factually insufficient to support the trial court's decision that appellant's parental rights should be terminated.   We affirm.

## I.  BACKGROUND

In late 2008 and early 2009, appellant became the subject of investigations by the Department of Family and Protective Services ("the Department"), involving the three children who are the subject of this termination proceeding.   Appellant was charged with physical neglect in 2008, and again in February 2009.   There were physical abuse charges and neglectful supervision charges in 2009 involving sexual abuse by the children's grandmother's boyfriend.   Because of the investigations, on June 30, 2009, appellant temporarily relinquished her parental rights to a friend of hers named K.J. Appellant stated that she relinquished her rights because she was under investigation and didn't want the children to go to a foster home.   Thirty days after she relinquished her parental rights, she changed her mind and attempted to revoke the relinquishment.   The children remained with K.J. until September 2009, when physical abuse charges were made against K.J.   They were then placed in foster care in the Ramey home where they resided at the time of trial.   K.J. was made a part of these proceedings because she wanted the children returned to her home.

Leslie Switzer, a clinical social worker, testified at trial that she had been counseling the two older children since December 2009.   She testified that D.G., then

twelve years old, told her that he suffered abuse at the hands of appellant. He told Switzer that he was hit with whips and was made to eat feces and drink urine by his mother. D.G. also alluded to abuse by his grandmother's boyfriend, who would rub his genitals on him and urinate on him. D.G. told Switzer that he told his mother about the abuse. D.G. also told Switzer that while in K.J.'s care, she had whipped him and locked him in a closet for extended periods of time. Switzer believed D.G.'s allegations to be true.

With respect to N.K., who was nine years old at the time, Switzer testified that he also indicated that appellant would make him eat feces, would take him out to the garage to set fire to things and then took him to a treatment center and had him detained in a psychiatric facility. He also alleged sexual abuse by his grandmother's boyfriend. N.K. told Switzer that appellant would "rub his penis until it would stand up." According to Switzer, appellant told N.K. that she had implanted a chip in his head and that if he ever talked about that, she would find him and kill him. He has dreams of appellant killing him with an axe and draws a lot of pictures depicting the dream in therapy. N.K. also told Switzer that he had been whipped by K.J. and put in a closet.

On cross examination, Switzer said that she did not believe the children had "manufactured" the things they told her. She also testified that the children reported the abuse by the grandmother's boyfriend before she became their counselor.

Olivia Ramey, the children's foster mother, testified that all of the children were doing well in her home. They began to regress somewhat when they learned that they might be placed with their father's parents who live in Ohio. Their father was in prison at

the time of trial, and is not the subject of this proceeding. Ramey reiterated that N.K. told her that appellant had put a "chip" inside him so she would know where he was. Ramey said when the children came into her home in 2009, they were malnourished physically and emotionally "were a mess." She and her husband taught them personal hygiene and how to eat. She testified that the older boys told her that C.K., the three-year-old, would be hit on the mouth with a belt by appellant and C.K.'s grandmother. On cross examination, she agreed that everything she knew about K.J., she learned through the children.

Mary Ann Menning, the Court Appointed Special Advocate ("CASA") volunteer assigned to the case, said that she visited appellant's home only one time. She testified that the yard was overgrown, the garage was full of boxes, and it was not organized. She described appellant as very gracious. Inside the home, there were boxes and debris, dirty dishes were stacked everywhere and the middle of the floor was all black. The children's bedroom was the "closest to normal." She would not have recommended the boys to be returned to this home. Menning got the impression when she was there that appellant had "given up." She thought appellant intended to get the children back, but was unable to take the first step. Menning opined that it was in the children's best interest that appellant's parental rights be terminated.

K.J. testified that neither she nor her husband ever used corporal punishment on the children. She denied that there was spanking or whipping while the children were in her care. She disputed all of the testimony presented by the CASA volunteer and others. Counsel pointed out that all of the information the trial court was hearing was passed to

4

the adult witnesses by the children. K.J. testified that she kept a journal and did everything CPS asked her to do. She said the children were happy while in her care. There was never any follow-up by CPS after the children were taken from her home. She thought it was possible that the two older boys fabricated what had happened to them. She said the children reported incidents to her regarding appellant and the grandmother's boyfriend.

Appellant testified that her home has running water and electricity. If given the opportunity, she could finish up the housekeeping services that were supposed to occur. She said she attended counseling and completed a parenting plan. She claimed that she e-mailed Amy Sanders, who was supposed to do the housekeeping services, to let her know when she returned from the holidays. Appellant testified that she was waiting to hear from Sanders, but did not. Appellant testified that she wants to visit the children, but the children's doctor advised against it. She stated that she thought the children probably think she doesn't care for them because she is prohibited from visiting them. According to appellant, N.K. told her that if she did not marry his father "he will make it to where he would never see me again . . ." She believed that D.G. was being coerced into saying things against her. She did not force her children to eat feces or drink urine. She was never told that the boys were being molested by her mother's boyfriend. No one had ever abused her children in her presence. Appellant testified that she had many caseworkers involved in the case, which made it difficult to get the services she needed.

Dawn Bustamonte, a Department caseworker, who had been assigned the children's case since May 2010, testified about whether appellant completed all of the

5

required services. She ultimately opined that as of December 2010, appellant had not completed her service plan and had not insured that her home was safe and sanitary. During cross-examination, Bustamonte noted that an individual named Boone was supposed to have contacted appellant for counseling. She does not know if Boone ever contacted appellant to start services. She said she would never use Boone again, presumably because she failed to follow-up with appellant. The last time Bustamonte saw appellant was September of 2010.

Amy Sanders, who performs housekeeping services for the Department, testified that she had never met appellant. She emailed her in November and December of 2010 to make an appointment to meet. Sanders told appellant that she would be at appellant's house on December 3, 2010. She did not get a response from appellant, and when she went to the house, no one answered the door. Sanders noted that when she arrived at the home, the washer was running in the garage. Sanders left a card, but received no further response from appellant. In January, appellant e-mailed Sanders to ask her to make an attempt to come to the house or e-mail her. Appellant had been out of town for the holidays. Sanders did not contact appellant again because the case had been closed.

## II. STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex.

6

App.—Corpus Christi 2006, no pet.). Termination must be supported by clear and convincing evidence. *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.,* 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

In reviewing the legal sufficiency of the evidence supporting parental termination, we should "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.,* 163 S.W.3d at 85. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *Id.* We must also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact finder's findings and not supplant the court's judgment with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) of the Texas Family Code and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.,* 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a

reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.,* 209 S.W.3d at 108.

### III. STATUTORY GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

Section 161.001 of the Texas Family Code sets forth the grounds upon which the court may involuntarily terminate a parent-child relationship. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011). In this case, the Department sought termination pursuant to subsections (D) and (E) of section 161.001 of the family code. *See id.* The trial court found that appellant had: (1) knowingly placed or allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. *Id.* § 161.001(1)(D) & (E).

A trial court may order termination if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *Id.* § 161.001(1)(D). Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), we examine the evidence related to the environment of the child to determine if the environment is the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied).

8

The parent's conduct does not necessarily have to be directed at the child. *See Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Abusive or violent conduct by a parent may produce an environment that endangers the physical or emotional well-being of the child. *In re J.T.G.*, 121 S.W.3d at 125. The requisite endangerment may be found if the evidence shows a parent's course of conduct that has the effect of endangering the child's physical or emotional well-being. *See Smith v. Sims*, 801 S.W.2d 247, 250 (Tex. App.—Houston [14th Dist.] 1990, no writ).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of appellant's conduct, including acts, omissions, or failures to act. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("[A] child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards."); *see In re J.T.G.*, 121 S.W.3d at 125. Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE ANN. § 161.001(1)(E). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Here, the evidence was contested. The trial court was faced with weighing the veracity of the children's outcries against appellant's and K.J.'s denials of wrongdoing. The evidence concerning the children's outcries of abuse and neglect, relayed to their counselor and court appointed advocate, was admitted without objection. It was within the trial court's discretion to believe that the children's grandmother's boyfriend sexually abused the children and appellant knew. The trial court could also have believed that appellant sexually abused one child and beat all of them. The trial court could have also believed that appellant totally failed to provide a safe and sanitary environment for the children.

It is the trial court's function, as the trier of fact, to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony. *In re R.W.*, 129 S.W.3d at 742. The trial court was entitled to believe all, part, or none of the testimony of any witness. *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo 2005, no pet.). Based upon the evidence, the trial court could have reasonably formed a firm belief or conviction that appellant knowingly placed or allowed the children to be placed in conditions or surroundings that endangered their physical or emotional well-being, or that she engaged in conduct or knowingly placed the children with a person who engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D) & (E). We overrule issues two and three.

10

## IV. BEST INTEREST OF THE CHILDREN

By her first issue, appellant asserts that the trial court erred in determining that termination was in the children's best interest. In deciding whether termination is in a child's best interest, the fact-finder may consider the following non-exhaustive list of factors outlined by the Texas Supreme Court: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the person seeking custody; (5) the programs available to assist those persons in promoting the best interest of the child; (6) the plan for the child by those individuals or by the agency seeking custody; (7) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate; (8) the stability of the home or proposed placement; and (9) any excuse for the acts or omissions of the parents. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). "'Best interest' does not require proof of any unique set of factors, nor does it limit proof to any specific factors." *In re D.M.*, 58 S.W.3d at 814. The party seeking termination need not prove that each of the *Holley* factors favor termination, and the same evidence of acts or omissions used under section 161.001(1) of the family code may be probative in determining the best interests of the child. *See In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

There was testimony that the children were doing well in foster care. The foster parents hoped to adopt them. The children were doing better emotionally and were happy. They want to remain with the foster parents. There was evidence before the

11

trial court from which it could have concluded that the existing parent-child relationship was not appropriate. Taking into consideration all of the evidence in the record, we hold that a reasonable fact-finder could have formed the firm belief or conviction that it was in the best interest of the children to terminate appellant's parental rights. Thus, the evidence supporting the trial court's best interest finding is legally and factually sufficient. We overrule issue one.

## V. REASONABLE EFFORTS TO RETURN THE CHILDREN

By appellant's fourth issue, she argues that the evidence admitted at trial was legally and factually insufficient to show that the Department had made reasonable efforts to return the children to the mother. The trial court's ruling was based upon subsections (D) and (E) of section 161.001(1) of the family code. Subsection (N) of section 161.001(1) discusses constructive abandonment and requires the Department "to make reasonable efforts to return the child to the parent." TEX. FAM. CODE ANN. § 161.001(1)(N). Section 161.003 of the Texas Family Code, titled "Involuntary Termination: Inability to Care for Child," also requires reasonable efforts to return the child in circumstances where termination is sought under that section. *Id.* § 161.003. However, in this case, termination was not sought under these sections. Although the evidence was contested with respect to whether the Department's difficulties in providing services was appellant's fault or the Department's, resolution of that issue was not necessary to the trial court's ruling. Regardless, the trial court could have properly weighed the conflicting evidence in favor of the Department. We overrule issue four.

12

## VI. CONCLUSION

Having overruled all of appellant's issues, we affirm the judgment of the trial court.


ROSE VELA
Justice


Delivered and filed the
1st day of March, 2012.